# PENNSYLVANIA.

| 5wh | 9 |
| 134 | 179 |
| 5 Wh | 9 |
| 22 SC | 625 |

| 5 Wh | 9 |
| 26 SC | 8 |

EASTERN DISTRICT, DECEMBER TERM, 1839.

[PHILADELPHIA, 1839.]

## RIDDLE *against* WELDEN.*

### IN ERROR.

*The goods of a boarder are not liable to be distrained for rent due by the keeper of the boarding-house.*

THIS was a writ of Error to the District Court for the City and County of Philadelphia, to remove the record of an action of replevin brought by John S. Riddle, against Washington Welden, for certain articles of furniture.

On the trial in the Court below, the jury found the following facts as a special verdict:

"That the defendant was the bailiff of James Simpson at the time of the distress. That there was due to the said James Simpson from the said Mary Harrison for rent in arrear, at the time of the

---

\* This and the three following cases were argued and adjudged at the March Term last, but the opinions were not received in time for insertion in the 4th volume.

said distress, of the premises in question, the sum of one hundred and forty-six dollars and fifty cents, with six dollars and sixty-nine cents interest; in all one hundred and fifty-three dollars and nineteen cents.

That the said Mary Harrison kept a boarding house.   That the said plaintiff boarded with her—and that the articles enumerated in the declaration were the property of the plaintiff, and were in the two rooms occupied by Mr. Riddle as a boarder; and that at the time these goods were distrained there were other goods in the house belonging to the said Mary Harrison, of sufficient value to pay the said rent in arrear.

If upon the above facts the Court shall be of opinion in favour of the plaintiff, then they find for the plaintiff, and assess damages at twenty-five dollars. But if the Court shall be of opinion in favour of the defendant, then they find for the said defendant, and that the sum of one hundred and fifty-three dollars and nineteen cents, is due from the said Mary Harrison to the said James Simpson, for rent in arrear and interest."

The District Court rendered judgment on this verdict, in favour of the defendant; upon which the plaintiff took this writ of error.

Mr. *Hazlehurst* for the plaintiff in error.

1. It was a rule of the feudal law that "the landlord, had a right to distrain the goods of a stranger." At that time chattels were of little value—while from the peculiar character of the relation between the lord and his vassal, such a rule was necessary to prevent the former from being defeated of his services by the interference of a stranger. No such reason exists at this day; and that there is a disposition to relax the severity of the old rule, it is only necessary to refer to the cases decided in Westminster Hall since the revolution. *Gilman* v. *Elton,* (3 *Brod. & Bingh.* 75, S. C. 7 *Eng. Com. Law Rep.* 355.)   *Thompson* v. *Mashiter,* (1 *Bingh.* 283, S. C. 8 *Eng. Com. Law Rep.* 325.)   *Fisher* v. *Algar,* (2 *Carr. & Payne,* 374, S. C. 12 *Eng. Com. Law Rep.* 179.)   *Brown* v. *Shevill,* (2 *Adolph. & Ellis,* 138, S. C. 29 *Eng. Com. Law Rep.* 51.) Things delivered to a person exercising a public trade, to be carried, wrought, worked up or managed in the way of his trade or employment, are privileged from distress. The particular kind of trade or occupation is not mentioned, nor is the *degree* of care or labour to have any thing to do with the application of the rule. The privilege is for the *trade* or *employment* of the tenant.

2. The most plausible argument in favour of the landlord is, that inasmuch as he has given credit to a visible stock on the premises, he should have recourse to that. How is it where the kind of business of the tenant is such as to bring home to the landlord the *knowledge of the fact,* that the property on his premises is there

(Riddle *v.* Welden.)

necessarily from the very nature of the business for which he has leased it. Is he to use his premises as a decoy? When the law gives to the landlord the property on the premises, it does not mean that he can distrain for the property which comes in the way of the particular business. It has been said by the Court of Exchequer, that the privilege exists only where the common presumption is, that the goods belong not to the owner of the house but to his customers. *Wood* v. *Clark,* (1 *Crompton & Jarvis,* 497, cited in 29 *Eng. C. L. Rep.* 51.) When the course of business must of necessity place the tenant in the possession of the property of his customers, the same is exempted. The landlord is supposed to know the purposes for which his house is let; and being for his interest he is considered to have waived his privilege. It is for his interest, because the price of exemption is paid by the tenant to the landlord in the shape of an enhanced rent. *Sims* v. *Brown,* (17 *Serg. & Rawle,* 139.)

Mr. *Perkins,* for the defendant in error.

By the common law all the moveable things in general, which may be found upon the demised premises, may be taken under a distress for rent, whether they be the property of the tenant or of another person. *Comyn's Landlord and Tenant,* 382. *Woodfall's L. and T.* 349 ; *Crozer* v. *Thomlinson,* (*Barnes,* 472 ;) *Parslow* v. *Cripps,* (*Comyn's Rep.* 205 ; *Salk.* 249, *n.* ;) *Fowkes* v. *Joyce,* (2 *Lutw.* 1161 ; 3 *Lev.* 260 ;) *Francis* v. *Wyatt,* (1 *Wm. Blk.* 483 ; S. C. 3 *Burr.* 1498 ;) *Gorton* v. *Falkner,* (4 *T. R.* 565.) The same general rule obtains in New York. *Spencer* v. *M'Gowan,* (13 *Wend.* 256 ; 4 *Am. Com. L.* 494.) In South Carolina. *Himely* v. *Wyatt,* (1 *Bay,* 102.) And has been recognized and adopted by the Courts of this state. *O'Donnell* v. *Seybert,* (13 *Serg. & R.* 57 ;) *Weidel* v. *Roseberry,* (*Id.* 180 ;) *Kessler* v. *M'Conachy,* (1 *Rawle,* 435 ;) *Marley* v. *Dupuy,* (2 *Whart.* 166.) And by the Act of Assembly of 21st March, 1772, which speaks of the tenant or *owner* replevying goods distrained for rent ; *Purd. Dig.* 870. The seventh section of the same act, page 872, extends the privilege of the landlord and allows him to distrain things exempt by the common law. No disposition has been manifested by the legislature to extend the exceptions ; but on the contrary the tendency is to diminish them.

The exceptions are as old, and almost as well settled as the rule itself. At common law, three descriptions of goods are exempt from distress absolutely. 1. Fixtures. 2. Things delivered to a person exercising a public trade, to be carried, wrought, worked up, or managed in the way of his trade. 3. Sheaves of corn. Two descriptions of things are exempt *sub modo;* and only in case there are other goods on the premises sufficient to answer the distress. These are, 1. Beasts of the plough and instruments of husbandry. 2. Tools of a man's trade. 3 *Bla. Com.* 7 ; *Simpson* v.

(Riddle *v*. Welden.)

*Hortop*, (*Willes*, 512 *; S. C.* 19 *Law Library*, 140 *; Smith's Selection of Leading Cases ;) Gilman* v. *Elton*, (3 *Brod & Bing.* 75, 7 *Eng. Com. Law Rep.* 355 *;) Thompson* v. *Masiter*, (1 *Bing.* 283, 8 *Eng. Com. Law Rep.* 324 *;) Matthias* v. *Mesnard*, (2 *Car. & Payne*, 353, 12 *Eng. Com. Law Rep.* 166 *;) Brown* v. *Shevill*, (2 *Adol. & Ellis*, 138, 29 *Eng. Com. Law Rep.* 51 *;) Fenton* v. *Logan*, (9 *Bing.* 676, 23 *Eng. Com. Law Rep.* 416 *;) Wood* v. *Clark*, (1 *Tyrwhit*, 314, S. C. 1 *Cr. & J.* 484 *;) Muspratt* v. *Gregory*, (1 *Mee. & W.* 633 *;) Brown* v. *Sims*, (17 *Serg. & Rawle*, 138.)

The goods distrained in this case if exempt, are so absolutely; as they are not embraced in either of the second class. That part of the special verdict therefore, which finds that there were other goods on the premises, is mere surplusage, and can have no legal effect in the decision of this case. The only exception that can be supposed to embrace them is the second of the first class: things delivered to a person exercising a public trade, to be carried, wrought, worked up, or managed in the way of his trade. Keeping a boarding-house cannot be called a trade. Nor is it any part of the business of a boarding-house keeper to receive furniture. Her business, even if decided to be a trade, is to receive guests and supply them with food and lodging; but it forms no part of her business, as the keeper of a boarding-house, to receive and take care of the furniture of third persons. It may have been convenient for both parties that the plaintiff should furnish his own rooms; and by doing so, it could be but a gratuitous bailment of the furniture to her. *Woodfall*, 355, has this very case; goods in a furnished room. Lord ABINGER, in *Muspratt* v. *Gregory*, says: " Looking at every one of the cases in which the exception has been acknowledged or established, it will be found that the trade itself consists in dealing with other men's goods." ALDERSON, B., in the same case, though he extends the meaning of "managed," as defined in *Simpson* v. *Hartop*, yet restricts it to the working up goods from an unwrought state as a manufacturer; and to the dealing with goods as an article of trade in their original or wrought state as articles of commerce. Mrs. Harrison, therefore, exercised no public trade within the meaning of the exception; nor did she manage these goods in such a sense as the law says shall exempt them from distress.

Mr. *Holcomb* in reply.

In *Gisbourn* v. *Hirst*, (*Salkeld*, 250,) it is said, that "goods delivered to a person exercising a public trade or employment to be carried, wrought, or managed in the way of his trade or employ, are for that time under a legal protection, and privileged from a distress for rent." The keepers of boarding-houses are persons exercising a " public employment." It is generally their only occupation: they make their living and support their families by it. They live by the public patronage, which they often solicit through advertisements

(Riddle *v.* Welden.)

in the newspapers, and by having signs up. Hardly any employment is more *public.* Again, the goods of their guests are received for the purpose of being "*managed.*" From the time they are brought upon the premises the guest has nothing to do with them in the way of *managing* them. They are taken care of, cleaned and *managed* by the host or his servants. This case then comes *literally* within the exceptions established almost as early as the rule itself. But the recent cases have gone still further. In *Gilman* v. *Elton,* it is intimated that "the public convenience and advantage," are to determine whether in the particular case the landlord shall have his right of distress as against the goods of a stranger. The English decisions profess to put the exceptions on the ground of "the benefit to trade." But they have held that an ox of a butcher at a neighbouring slaughter house was exempt; *Brown* v. *Ellis.* The business of a butcher has very little to do with "trade," in its more general acceptation, and certainly no more to do with it than the business of a boarding-house keeper has. But I take it, it is rather "the public advantage and convenience," without reference to the particular trade or employ, that should form the exception. In *Brown* v. *Sims,* a very sound rule is laid down by the Chief Justice in these words, and I invoke the doctrine as applicable to this case. "Where the course of the business must necessarily put the tenant in possession of the property of his customers, it would be against the plainest dictates of honesty and conscience, to permit the landlord to use him as a decoy, and pounce upon whatever should be brought within his grasp, after having received the price of its exemption in the enhanced value of his rents." It can never then be permitted to a landlord to take the property of his tenant's guests to pay that tenant's rent. The landlord does, in the case of renting his house for a boarding-house, actually receive in the "enhanced value of his rents," the price of any such exemption. It is well known that a house will rent for a boarding-house, in a suitable location, for a higher price than could be got for it, for any other purpose. Would it not be monstrous to allow the landlord to resort to the private property—the little articles of comfort and convenience of the boarder who pays the price of his board to the tenant, and thereby enables the landlord to ask and receive a large rent for his house? All the analogies are in favour of exempting the goods of a boarder. Instance the case of goods at an inn. Now it must be conceded, that these are exempt, and yet, in what do our boarding-houses differ from inns? Many of them in no particular but in the absence of a bar. Again horses at livery are exempt. *Youngblood* v. *Lowry,* (2 *M'Cord's Reports,* 39,) as are also carriages, harness, &c., on the premises. Then if a man gets his horse boarded or kept, the landlord cannot take the animal or any property the owner may have there to use in connection with his horse, but if the same individual hires board for himself, any

. (Riddle *v.* Welden.)

articles he has with him for convenience and use, and such articles particularly in the case of families at board, are often indispensable, shall be liable to distress! Reason and justice, as well as all analogies to be drawn from the authorities, are opposed to such a view.

The cases cited on the other side are clear and full as to the general right of the landlord to distrain all property found on the premises. But the cases establishing the exceptions are also equally full and equally clear, and no authorities have been cited that couflict with *Gilman* v. *Elton,* and *Brown* v. *Sims;* which cases establish the law as it is at *this day,* both in *Westminster Hall,* and in *Pennsylvania.* The rule, even subject to the exceptions, has little in reason, justice, or common honesty, to recommend it. The preference of the landlord as between himself and the tenant, over all other creditors—the baker who supplies the family with bread, the physician who attends them in sickness—is hard enough. But it cannot be permitted to him, in his character of landlord, to take the goods of a stranger, when there are other goods on the premises sufficient to pay the rent. *Fenton* v. *Logan,* (23 *E. C. L. R.* 416.) As to the remark that boarders need not necessarily have goods on the premises, I reply, that in point of fact, they almost always have; and that it is the supposition that guests at an inn, would have property there, that first induced the exception in their favour. I say in the latter case, the fact denied in this, is *assumed;* and upon its assumption an important class of exceptions have long since been established. None will deny that a boarder would not be quite as likely to have goods at his boarding-house as a guest would to have them at an inn. The authorities and all the analogies to be drawn from them are in favour of making the goods of a boarder at a boarding-house exempt from distress for rent.

The opinion of the Court was delivered by

GIBSON, C. J.—The case submitted by this verdict falls distinctly within the principle of *Brown* v. *Sims,* (17 *Serg. & Rawle,* 138,) that, for the benefit of trade, a thing put upon rented premises by a customer in the way of the tenant's business, is privileged from distress. The principle is a growing one, and embraces every case which can be brought at all within it. It sprung from necessity in the first instance, and began with the exemption of a guest's effects at an inn, because, as it was said, the innkeeper is bound to receive them; and the privilege was, for that reason, very strangely thought to be that of the innkeeper himself. Were it a benefit for him to prevent the lessor from getting the rent from a stranger, there would be something like reason in conceding it to him in compensation of his duty to receive those who favour him with their custom; but being answerable to them for their effects in his charge, he can neither gain nor loose by their exemption; for its supposed effect

(Riddle *v.* Welden.)

in the attraction of custom, being as fully enjoyed by his competitors, can no more benefit him than could the want of it prejudice him. The guest voluntarily puts his property within the sphere of the lessor's authority; and the inability of the tenant to prevent it, being a matter with which the lessor has no concern, ought, in reason, no more to affect him than if the reception were, in point of law, as it is in point of fact, a matter of mutual consent. If the privilege be the tenant's, it is a barren one, for it would poorly compensate the weight of his legal obligation if that were a burthen to him; and if it be, as it undoubtedly is, the guest's, it must stand on some other principle. Perceiving this, we are told that the goods are privileged because they are at the inn by the authority of the law. What magic is there in that? It was said by counsel in a case presently to be noticed, that it would be absurd for the law to give a guest a right to put his cattle into the stable of an inn and at the same time to give the lessor of it a right to take them out. But whatever be its impolicy, the absurdity of it is not very apparent. Knowing the consequences, he would put them in at his peril; for though the innkeeper would be bound to respect the immunities of hospitality, it follows not that every one else would be bound to do so. His effects would certainly not be in the custody of the law; nor would they be at the inn any more by its authority, than would the person of the owner who could not oppose the privilege of the place as a bar to seizure of it in execution. In fact his right to enter and use the inn for his accommodation, stands on the footing of his legal right to enter and use his own house which is his castle, and, in other respects, more highly privileged. It is his own while he uses it; and Falstaff speaks with legal precision when he demands, "Can I not take mine ease in mine inn?" A legal authority to enter a place makes it not a sanctuary if every one else has the same authority to enter it; indeed the sanctity of a man's house into which he has an exclusive right to enter, exempts not the furniture of it. Were the authority to enter the true foundation of the privilege, it would rest, with us, on a very questionable principle; for I am not aware of any decision by an American Court that an innkeeper is bound in all cases to entertain a guest against his will; and a practice to the contrary is universal. There certainly may be instances of such grievous hardship—for instance in the capricious rejection of a traveller at nightfall when other accommodations cannot be had—as to make the public invitation held out by the sign-post a fraud in the particular instance; but an action for it must, I should suppose, be maintained on the special circumstances of the case rather than on any inflexible rule. Not however to insist on that, we are at a loss for a reason why there should be a difference as to the nature of the privilege, betwixt goods at an inn and an ox at the shambles, corn at a mill, merchandize in a warehouse, or any other member of the class whose exemption

(Riddle *v.* Welden.)

is founded concessively not on a supposed obligation of the tenant, but on public convenience merely. The truth seems to be that the exemption of goods at an inn, being of the first necessity, led the way to the exemption of things privileged for the encouragement of trade, before the reason which gave birth to it was understood; and, as in cases of physical phenomena uninvestigated in the relation of cause and effect, the first thing which served for an explanatory principle was laid hold on that presented itself. But since a necessity for the same exemption has been unfolded by experience, in cases which admit of no such principle, it has become evident that there is a better one than that which assumes the innkeeper's obligation to be the foundation of it; and what other can there be but that of public convenience, which, though *text writers have adhered to the original distinctions in the management of the subject*, is broad enough to cover the whole ground? That, and not the duty of the innkeeper, being the principle of exemption, how is a lodging house to be distinguished, for the purposes of the argument, from an inn? There is much sound reason in the opinion delivered in *Youngblood* v. *Lowry*, (2 *M'Cord's Rep.* 139,) which is as appropriate to a lodging house here as it was to a livery stable there; for it would be an anomaly were a guest's cattle exempt at the one, if his baggage were not so at the other. Indeed the difference between a lodging house and an inn, consists mainly, in this, that the keeper of the former is not a licensed retailer of liquors—a fiscal peculiarity merely—and that the guests are not so transient. It is said by text writers, however, that the privilege even of an inn extends not to a permanent lodger because he is substantively a tenant; and for this, the apocryphal case of *Francis* v. *Wyatt* is cited, *in which nothing of the sort was* adjudged: for though it was asserted by counsel that the plaintiff had taken the coach-house for a year—a fact that would have concluded him had it been found—the judgment was rendered for the defendant, as appears by the report of the case in *Sir William Blackstone's Reports*, because the price of keeping the chariot was parcel of the profits—a ground of adjudication which is not very intelligible indeed, but one which is very distinct from undertenancy. Granting, however, that no exemption can be claimed by an undertenant in an inn or elsewhere, is a mere lodger in that predicament? In the first place, he pays for lodging, but no rent. Compensation for the use of his chamber is not a separate charge; nor could his chattels be distrained for it, or any thing be recovered of him in an action for use and occupation. In the next, he has no term or interest in the place; for though a chamber is incidentally assigned to him among the appliances of the tenant's business, he has no other title to it than he has to the plate off which he eats, or the chair on which he sits at table: it is his while he uses it, but another's the moment he relinquishes it. Why then shall not the public nature of the house protect his

effects in it?   Even the English decisions subsequent to *Francis v. Wyatt*, have extended the principle of protection to all cases of public convenience; and there is no reason why a lodger's apparel, escritoire, or other matters of personal comfort, should be less protected by the publicity of the house, than his goods are by the warehouse in which they are deposited, or the wharf at which they are landed.  The keeping of a boarding and lodging house, is as distinctly a public profession here, as is that of a warehouse-man or wharfinger in England; and it necessarily has the same incidents.   It was asserted by counsel in *Francis* v. *Wyatt*, as the argument is given in Burrow's Reports, that a privilege of exemption cannot be sustained on the foot of convenience in any case; but subsequent decisions prove it to be the true foundation in all cases.   It would not be less prejudicial to the public than unjust to the owner, were his property liable to be seized for the duties of those through whose hands, in the current of the world's business, it must pass.   If, then, a feudal prerogative, unjust in its essence, and based upon a political constitution of things which never existed here, has been so far restrained in England as to get rid of this particular oppression, where a mitigated infeudation is still suffered to exist, it ought the rather to be so here where land is, not only allodial, but a chattel for the satisfaction of debts.   There is, therefore, no reason to withhold the protection of the modern principle from the inmates of a lodging-house.

Judgment reversed, and judgment entered for the plaintiff.