## STATE *v.* RALPH H. FIELD.

### May Term, 1921.

Present:   WATSON, C. J., POWERS, TAYLOR, MILES, and SLACK, JJ.

Opinion filed October 4, 1921.

*Criminal Law—Harmless Error—Proof of Undisputed Fact by Improper Evidence—Evidence—Explanatory—Narrative— Corroboratory—Improper Remarks Provoked by Opposing Counsel—Election of Offences—Selling Diluted Milk— Samples Not Taken as Provided by Statute—Principal Responsible for Dilution by Agent—Knowledge or Intent Immaterial.*

1.   The admission of improper evidence to prove an undisputed fact is harmless error.

2.   In a prosecution for selling milk diluted with water, where it appeared during the cross-examination of a State's witness that he had pleaded guilty to selling and furnishing watered milk, and he was asked if since that time he had not been to B.'s house and urged B. and his wife to plead guilty to a like charge and pay their fine, which he denied, on redirect examination he was properly permitted to testify that he called at B.'s house after he pleaded guilty, and to explain why he was there.

3.   The admission of incompetent evidence, which was merely a part of the narrative by a State's witness of how the respondent's milk came to be examined, was harmless.

4.   The sheriff was properly permitted to testify that he asked the State's witness (who had testified that he stopped at B.'s house after he had pleaded guilty) to stop at B.'s house on his way home and ask him to come to town the next day, as it tended to corroborate the witness.

5.   Permitting a witness to testify as to her understanding of a certain matter was harmless error, where she had already testified to facts from which no other understanding was deducible, and where, too, the subject-matter of the inquiry was undisputed.

6.  A respondent cannot complain of remarks by the State's attorney which were provoked by improper statements by respondent's counsel during the examination of witnesses.

7.  Since the complaint contained only one count, and the State's evidence tended to show three separate offences, it was error for the court to refuse, at the close of all the evidence, to require the State to elect the offence on which it would rely for a conviction, and to allow the case to go to the jury on all the evidence of offences.

8.  G. L. 5907, prohibiting the sale of milk diluted with water, is not supplanted or modified by G. L. 5935, providing that, in the absence of an agreement in writing providing for a different mode of payment, the price of milk and cream sold to creameries, etc., shall be based upon a quality test; and, a person selling milk diluted with water violates G. L. 5907, irrespective of whether the milk is sold by weight, measure, or quality.

9.  Samples of respondent's milk were competent evidence, although the provisions of G. L. 5909, 5910, were not followed when they were taken for examination, and the court properly refused to charge that such noncompliance must be taken by the jury as weakening the value of the tests as evidence; it being for the jury, rather than the court, to say what weight should be given it.

10.  Where the owner of milk employed another to carry milk to a creamery to which it was sold, and the employee watered the milk while on the way, without the owner's knowledge or consent, the latter was guilty of a violation of G. L. 5907; knowledge, or guilty intent, being immaterial to the offence.

COMPLAINT for selling and furnishing milk diluted with water. Plea, not guilty. Trial by jury in the Burlington City Court, Chittenden County, *Jed P. Ladd,* City Judge. Verdict and judgment of guilty. The respondent excepted. The opinion states the case.

*Martin S. Vilas* for the defendant.

*Ezra M. Horton,* State's Attorney, for the State.

SLACK, J. The respondent stands convicted of selling and furnishing milk diluted with water in violation of G. L. 5907.

The sale complained of was to Charles Soules and Lucius White, who were operating a creamery under the firm name of Soules & White, and was made November 7, 1920.

One Murray carried the respondent's milk, milk that belonged to one Bisson, and his own, to the creamery each morning. Murray was hired by the respondent to carry the latter's milk to the creamery. The respondent claims that if his milk was diluted when delivered to the creamery it was diluted by Murray after it left respondent's farm.

[1] The State called Murray as a witness, and he was permitted to testify, subject to respondent's objection and exception that the evidence was immaterial, that all of the milk delivered by him to the creamery November 6 and 7, including his own, the respondent's, and Bisson's, was sold by weight. It is now urged that this was an attempt to prove that respondent's milk was sold by weight by showing that the witness' milk was sold that way. It appeared from the undisputed evidence of Lucius White, received without objection, that the creamery bought and paid for respondent's milk by weight. This being so, the respondent's position is this: Improper evidence was admitted to establish an undisputed fact—which is harmless error. *State* v. *Warner*, 91 Vt. 391, 101 Atl. 149.

[2] It appeared during the cross-examination of the same witness that he had pleaded guilty to a complaint for selling and furnishing milk diluted with water to Soules & White, November 7. He was afterwards asked if since that time he had not been to Bisson's house and urged Bisson and his wife to plead guilty to a like charge and pay their fine, which he denied. On redirect examination he was permitted to testify, subject to the respondent's exception, that the day he pleaded guilty to said charge he stopped at Bisson's house, on his way home, at the request of Sheriff Allen, and told Bisson that Allen wanted to see him. In view of the cross-examination this explanation of why he was at Bisson's house was competent.

[3] Dr. Ravey, health officer for the city of Burlington, was called by the State, and after testifying that in "picking up milk samples" he found milk that had been diluted with water, was permitted to testify, subject to respondent's exception, that he traced that milk to Soules & White's creamery. He then testified that on the mornings of November 6 and 7 he went to their creamery and took samples of respondent's milk, which

were later found to be diluted. It not appearing that the milk which the witness found when "picking up milk samples" belonged to the respondent, the evidence objected to was incompetent, but its admission was harmless; it being merely part of the narrative of how the respondent's milk came to be examined.

[4]    Sheriff Allen, called as a witness by the State, testified, in substance, subject to the respondent's objection that the evidence was immaterial, irrelevant, and incompetent, that he asked Murray, the day the latter pleaded guilty, to stop at Bisson's house, on his way home, and tell Bisson that he (Allen) had a warrant for him and ask him to come to Burlington the next day. This evidence tended to corroborate Murray on that subject, and was admissible for that purpose.

[5]    Mrs. Bisson, called as a witness by the respondent, testified that Murray came to their house after he pleaded guilty to watering his milk and told her and her husband "that the sheriff wanted us to come over that day, and that we had better come and pay, for it would cost us less money"; and that he urged her and her husband "to come in and pay his fine". On cross-examination she testified that Murray said that Sheriff Allen sent for her husband and that Murray said "it would be better for him to come, and might save him money, than it would to have the officer come for him". She was then asked if she understood from that statement that Murray came to notify her husband at the request of Sheriff Allen, and, subject to the respondent's objection that the evidence was immaterial, irrelevant, and incompetent and called for the witness' understanding, answered, "Yes". That the answer could not have prejudiced the respondent is too plain to admit of argument.

The witness had already testified to facts from which no other understanding was deducible. Therefore, reversible error is not shown. *State* v. *Williams,* 94 Vt. 423, 111 Atl. 701. This answer was harmless, too, because the fact that Murray went to see Bisson at Allen's request was undisputed. *State* v. *Warner*, *supra.*

[6]    Respondent's exception to the remark of the State's Attorney that he objected to "rotten poison" being put into the case is unavailing, in the circumstances. It is apparent from what appears in the transcript, which is part of the exceptions, that the remark excepted to was provoked by improper state-

ments made by respondent's attorney during his examination of the respondent and one Yantz. Since this is true, the respondent cannot be heard to complain. *Douglass & Varnum* v. *Village of Morrisville,* 89 Vt. 393, 433, 95 Atl. 810.

[7]   The complaint contains only one count.   The State's evidence tended to show that respondent's milk delivered at the creamery November 4, 6, and 7 was diluted with water.   The respondent attempted to make a motion that the State elect the day on which a conviction of the crime charged would be asked, but whether he succeeded in doing so is open to grave doubt. Enough was said, however, so that the court ruled, at the close of all the evidence, as follows: "The court leaves that with the jury to determine from the evidence in the case." This was error, and the exception must be sustained. *State* v. *Barr & Pianfetti,* 78 Vt. 97, 62 Atl. 43.

[8]   The respondent requested the court to charge, in effect, that if the jury found that Soules & White conducted a place where butter was made, such as constituted a "creamery, condensary or receiving station for milk," within the meaning of G. L. 5935, and the respondent believed that his milk "was being separated to make butter," he would not be guilty of the offence charged, even though he diluted the milk with water; and to the court's failure to so charge had an exception.   He contends that the purpose of G. L. 5935 is "to supplant" G. L. 5907, where milk is sold to creameries in the absence of an agreement in writing that such milk shall be paid for on some basis other than the quality test; or, in other words, if the price of milk sold to a creamery is to be determined by the quality of the milk, it is not a violation of G. L. 5907 for the seller to water it.   This claim is without merit.   These statutes, namely, sections 5907 and 5935, are for manifestly different purposes; the purpose of the former is to insure the buyer of milk, whoever he may be, against a diluted or adulterated commodity, while the purpose of the latter is to apprise the seller of milk to creameries of the quality of milk or cream delivered by him "as determined by weight or measure," and the quality, as determined by certain tests, is to furnish a basis for the price of such milk in cases where a special contract between the seller and buyer does not exist.   The former statute is aimed at the seller, the latter is aimed at the buyer, if a creamery.   We find nothing in the various legislative enactments which are embodied in these sec-

tions .of the statute to indicate that the Legislature intended the provisions of section 5935 to modify or supplant the provision of section 5907; and such is not their effect. Fraud and deceit not being an element of the offence charged, it is immaterial whether milk is sold by weight, measure, or quality.

[9] The provisions of sections 5909 and 5910 were not followed when samples of respondent's milk were taken for examination. The respondent requested the court to charge the jury that such noncompliance must be taken by the jury as weakening the value of the tests as evidence, and had an exception to the failure of the court to so charge. The request asked too much. It would have been error for the court to instruct the jury that they *must* take such failure as *weakening* the value of the tests. The evidence adduced was competent, at least it came in without objection, and it was for the jury, rather than the court, to say what weight should be given it. Moreover, no question was made but that samples of the respondent's milk were taken on the days named, nor was .it claimed that those samples were tampered with before they were examined by the chemist at the State Laboratory.

[10] The respondent requested the court to charge the jury that if Murray put water into the milk without the knowledge, wish, or consent of respondent, the respondent would not be liable. The court refused to so charge, and charged, in substance, that if the jury found that Murray was acting as employee or agent of respondent in delivering the milk in question to the creamery, and he diluted such milk while acting within the scope of his employment, the respondent would be liable, although the acts of Murray in diluting the milk were not authorized by respondent. To the failure of the court to charge as requested, and to the charge as given, respondent was allowed exceptions. The effect of respondent's contention is that the commission of the offence created by this statute depends upon the knowledge of the person accused that the milk sold was diluted, and therefore he is not liable for what his servant, who was custodian of the milk, did to it, unbeknown to him. Reasoning conversely, if knowledge is not an. element of the offence, it is immaterial who applied the water, or when, and the bald question is: Did the respondent sell milk diluted with water?

This statute was enacted, manifestly, as a means of protecting the public against fraud and imposition of vendors of inferior

and unwholesome milk, and should be given such interpretation, if possible, within the sound canons of construction, as will secure to the people the benefit intended by the General Assembly. The language of the statute does not in terms or by implication make knowledge an element of the offence created, and therefore such offence belongs to that class in which knowledge, or guilty intent, is immaterial and need not be shown in order to justify a conviction. In such cases it is the act itself, not the intent, that determines the guilt; the actual harm to the public being the same in one case as in the other. *State* v. *Gilmore,* 80 Vt. 514, 68 Atl. 658, 16 L. R. A. (N. S.) 786, 13 Ann. Cas. 321; *People* v. *Roby,* 2 Mich. 577, 18 N. W. 365, 50 A. R. 270; *City of Paducah* v. *Jones et al.,* 31 Ky. Law Rep. 1203, 104 S. W. 971; *Feeley* v. *United States,* 236 Fed. 903, 150 C. C. A. 165.

In the instant case the sale of the milk was not consummated until it was delivered at the creamery; down to that moment it belonged to the respondent, was in his custody, in the eye of the law, and he was responsible for its condition. If it was diluted when delivered at the creamery it is immaterial whether it was diluted by the respondent, or the person who did the milking, or the person who carried it to the creamery.

Other exceptions were taken, but, as the questions raised by them are not likely to arise on a retrial, they are not considered.

*Judgment and sentence reversed, and cause remanded for a new trial.*