# JULY TERM, 1858, AT LANSING.

## Selim Sears vs. Charles B. Cottrell.

The provisions of the tax-law of 1853, that, "In case any person shall refuse or neglect to pay the tax imposed on him, the treasurer shall levy the same by distress and sale of the goods and chattels of said person, *or of any goods and chattels in his possession*"; "and no claim of property to be made thereto by any other person shall be available *to prevent a sale*"—*giving* the owner of property sold to pay the tax of another a remedy against the person taxed — are not unconstitutional; and, therefore, where the owner of lumber brought suit for its value against the township treasurer, who, while the same remained awaiting shipment upon the mill premises where it had been manufactured, and in the possession of the occupant, had levied upon and sold the same to satisfy a tax assessed against such occupant, upon real estate, including said mill premises; — *Held*, That plaintiff could not recover.

The words "due process of law," as used in Sec. 32, Art. VI., of the *Constitution*, which provides that "no person shall be deprived of life, liberty, or property, without due process of law," mean *the law of the land;* by which are understood laws that are general in their operation, and not special Acts of legislation, passed to affect the rights of particular individuals against their will, and in a way in which the same rights of other persons are not affected by existing laws.

An Act of a State Legislature, not prohibited by the express words of the Constitution, or by necessary implication, can not be declared void, as a violation of that instrument.

In a case of doubt, every possible presumption, not clearly inconsistent with the language and the subject-matter, is to be made in favor of the constitutionality of State legislation.

The nature and objects of State Constitutions, and the true theory of legislative power, discussed *per* CHRISTIANCY J.

The theory and extent of legislative power to levy and collect taxes, discussed *per* CAMPBELL J. *dissenting*.

*Heard May 18th and 19th. Decided July 9th.*

Error to Saginaw Circuit.

Plaintiff in error brought trespass in the Court below for a quantity of pine lumber. Defendant justified the taking as township treasurer of Hampton, in the county of Saginaw,

under a tax-roll for the year 1856 and warrant annexed, authorizing and directing him to collect, among others, certain taxes assessed thereon against J. & B. Bird, and by virtue of which he took the said lumber, in the possession of said J. & B. Bird, and sold the same to satisfy such tax, after due notice in pursuance of law.

On the trial in the Court below, before Hon. S. M. Green, Circuit Judge, and a jury, it appeared in evidence that the lumber in question was the property of the plaintiff; that it was manufactured at the mill of J. & B. Bird, at Hampton, and, while there awaiting shipment, was taken and sold by defendant. Defendant proved that he was treasurer of Hampton for the year 1856. He was also permitted by the Circuit Judge to introduce in evidence the tax-roll of that township for the year above mentioned, and the warrant thereto attached; upon which roll appeared a tax assessed upon real estate against said J. & B. Bird, to satisfy which, finding this lumber in their possession, he levied upon and sold the same in pursuance of the statute. The mill premises upon which the lumber was manufactured, and where it still remained when levied upon by the treasurer, were part of the real estate for which the tax was assessed.

Exceptions having been taken by plaintiff to the admission of this defense, the case, after verdict and judgment for defendant, was brought to this Court by writ of error, for review upon the exceptions.

*W. L. Webber* and *M. Wisner*, for plaintiff in error:

The provision in the Act of 1853, authorizing the seizure and sale of one man's property to satisfy a tax against another, is unconstitutional. It conflicts with the letter and spirit of Sec. 32 of Art. VI., Secs. 11 and 12 of Art. XIV., and Sec. 14 of Art. XVIII., of the Constitution of Michigan.—*Taylor vs. Porter*, 4 *Hill*, 146; *White vs. White*, 5 *Barb.* 481; *Reed vs. Wright*, 2 *Iowa*, 22; *Blackwell*, 31, 32.

The seizure of property by a collector of taxes is analogous

to seizure by a sheriff on execution, and the Legislature might with equal propriety make possession, whether legal or tortious, of personal property, conclusive evidence of ownership in the one case as in the other.— *Wilson vs. Shearer*, 9 *Metc.* 504; *Blackwell*, 184.

*James Birney*, for defendant in error, cited *Debates of Const. Conv.* 1850, *p.* 822; *Williams vs. Mayor of Detroit*, 2 *Mich.* 565; *Brooks vs. McIntyre*, 4 *Mich.* 318; *Blackwell*, 2.

MANNING J.:

The lumber of plaintiff, while in the lawful possession of J. & B. Bird, was seized and sold by defendant, who was township treasurer and collector of taxes for the township of Hampton, to pay a tax of J. & B. Bird. By section 40 of "An Act to provide for Assessing Property at its True Value, and for Levying and Collecting Taxes thereon" (*S. L. of* 1853, *p.* 140), it is provided, " In case any person shall refuse or neglect to pay the tax imposed on him, the treasurer shall levy the same by distress and sale of the goods and chattels of said person, or of any goods and chattels in his possession, wherever the same may be found within his township; and no claim of property to be made thereto by any other person, shall be available to prevent a sale." Section 151 provides, "When any property shall be legally distrained and sold for the tax of any person, and such property shall be owned by another person, such owner may recover of the person for whose tax the same was sold the value of such property, in an action of assumpsit, as for goods sold and delivered; deducting therefrom the amount of any surplus which may have been claimed or recovered by such owner, as provided in this chapter."

That part of section 40, which authorized the seizure and sale of the plaintiff's lumber, to pay the tax of J. & B. Bird, it is insisted, is unconstitutional; and we are referred to several provisions in the Constitution supposed to be violated by it.

First, to the latter part of section 32 of Art. VI. The section is in these words: "No person shall be compelled in any criminal case, to be a witness against himself; nor be deprived of life, liberty, or *property, without due process of law.*" The words "due process of law," mean the law of the land, and are to be so understood in the Constitution. By Magna Charta it was provided, "No freeman shall be taken or imprisoned, or dispossessed of his free tenements and liberties, or outlawed, or banished, or anywise hurt or injured, unless by the legal judgment of his peers, or by the law of the land."—*Hume's History of England.* Lord Coke construed the words "law of the land," to mean *due process of law.* Hence, we sometimes find one phraseology used, and sometimes the other. They were held, and we think correctly, to mean the same thing in *The Matter of John and Cherry Streets*, 19 *Wend.* 659. By "the law of the land" we understand laws that are general in their operation, and that affect the rights of all alike; and not a special Act of the Legislature, passed to affect the rights of an individual against his will, and in a way in which the same rights of other persons are not affected by existing laws. Such an Act, unless expressly authorized by the Constitution, or clearly coming within the general scope of legislative power, would be in conflict with this part of the Constitution, and for that reason, if no other, be void. The law in question is not one of this class. It was not designed or intended to operate on the rights of the plaintiff, or any other individual, as such. This of itself is sufficient to take it from under this part of the Constitution, however obnoxious it may be to other parts of that instrument.

If it be said, The law is unnecessarily severe, and may sometimes do injustice, without fault in the sufferer under it, our reply is, These are considerations that may very properly be addressed to the Legislature, but not to the judiciary—they go to the expediency of the law, and not to its constitutionality. When courts of justice, by reason of such

objections, however well founded, seek for some hidden or abstruse meaning in one or more clauses of the Constitution, to annul a law, they encroach on the power of the Legislature, and *make* the Constitution instead of *construing* it. They declare what the Constitution should be — not what it is. The tendency of courts at the present day, we think, is too much in that direction. Hence, to some extent, the great number of constitutional questions that are constantly being brought before the courts for adjudication. The time was, and the period not very distant, when courts were reluctant to declare a statute void, and did not feel warranted in doing it unless they could lay their finger on the particular clause that was violated, and the conflict between the statute and Constitution was obvious. The judiciary is not above the laws and Constitution. Its province is to declare what the Constitution and laws are; giving a pre-eminence to the former, and declaring the latter void only when repugnant to it. And while performing this duty, it should be recollected its powers are as clearly limited by the Constitution and laws as those of the executive and legislative departments of the government. When they exceed their powers, their acts may be declared void by the courts; but there is no power given to any department of the government to annul the acts of the judiciary when it exceeds its powers; for which reason, if no other, it should always be careful to keep clearly within them.

We were also referred to sections 11 and 12 of Art. XIV., and section 14 of Art. XVIII., of the Constitution — the first relating to taxation and assessments, and the latter to property taken for public use; but we are unable to see anything in either of these sections, or in all of them taken together, having a direct bearing on the question.

The law is for the collection of a revenue of the State, and not of a debt between individuals. State exigencies are not to be measured by those of individuals; and experience has shown the necessity of more summary and stringent laws

for the collection of the revenues of the government, than have been found expedient to enforce the payment of debts between individuals. The Act, in effect, declares that personal property, in possession of a person taxed, shall be deemed his for the purpose of making the tax, when he refuses to pay it voluntarily. The property was in J. & B. Bird's possession, and lawfully so, for aught that appears, when it was taken. The plaintiff was aware of the law, or is supposed to have been—for ignorance of it is no excuse—which made the property liable, while in their possession, for the tax: and he also knew the same law made them responsible to him for its value in case it was taken. With the facts and law before him, he, in contemplation of law, took upon himself the risk; and if J. & B. Bird have proved unfaithful to him, and permitted his property to be taken and sold to pay their tax, it is not the fault of the State, or of the law; and the plaintiff is not remediless, as he has his action against them.

When the power in the Legislature to pass a law is called in question, and there is a reasonable doubt as to the power, it is better the Court should err in favor of the power than against it; as the error in that case may be more readily corrected by the people, through their representatives, than in the other, which would require an amendment of the Constitution.

I am of opinion the judgment of the Court below should be affirmed.

CHRISTIANCY J.:

My first impressions, on the argument of this case, were against the constitutionality of the law, and I was inclined to agree with my brother Campbell in holding it void. But subsequent reflection, and a more thorough investigation, have satisfied me that my first impressions were erroneous, and that the opinion of my brother Manning is correct; and in that opinion I entirely concur. But, as some other consider-

ations besides those stated in that opinion have had their influence in bringing my mind to this conclusion, it may not be improper to express them. In doing this, I may be compelled, in order to show the logical sequence of the propositions which I shall submit, to repeat some of the same principles contained in the opinion to which I refer, though I shall endeavor to avoid such repetition, except as it may be rendered necessary for the purpose indicated.

That the law in question may be inexpedient, and that its enforcement may sometimes produce hardship and injustice, I shall not attempt to deny. But the question here is not one of *expediency*, but of *legislative power*.

In discussing this question of the constitutional power of the Legislature, it is important that we start with clear ideas of the nature and objects of a State Constitution, as well as of the nature and true theory of legislative power; any error at the outset, any misconception of these fundamental principles, will, almost of necessity, increase in magnitude with every step we advance, and every inference we may draw in the progress of our inquiries.

The four following propositions, I think, express the true theory of the several State Governments in this Confederacy, so far as the present question is involved:

*First*, Each State is sovereign and independent, except as limited by the Constitution of the United States.

*Second*, The purpose and object of a State Constitution are not to make specific *grants* of legislative power, but to *limit* that power where it would *otherwise* be *general* or *unlimited*, as well as to impose certain duties upon the legislative and other departments. And, generally, it will be found that in our own State Constitution, like those of other States, powers are not specifically or expressly given, except in consequence of some express limitation which might otherwise be deemed to prohibit the power in question. It is true the Constitution expressly and imperatively requires the Legislature to make legislative provisions of a certain

5 MICH. — R.

kind, or upon a certain subject; but this is simply *imposing* a *duty*, not *granting* a *power*.

*Third*, Without any limitation of the legislative power in our Constitution, that power would have been, at least, as absolute and unlimited, within the borders of the State, as that of the Parliament of England, subject only to the Constitution of the United States, which does not come in question in this cause. The simple creation, by a State Constitution, of the legislative power, without any express specific grant of power, and without any express limitation, would have conferred this unlimited power: hence, the express limitations upon that power in the constitutions of the several States.—See 1 *Kent's Com.* 448; *Sill vs. Village of Corning*, 15 *N. Y.* 303. These principles have been fully recognized by this Court in *Scott vs. Smart's Executors*, 1 *Mich.* 306 *and* 307; *Williams vs. Mayor of Detroit*, 2 *Mich.* 560; *People vs. Gallagher*, 4 *Mich.* 244.

With the Constitution of the United States, the case is directly the reverse. The General Government is one of special, limited, and delegated powers only; and a power not conferred by the express terms of the instrument, or by necessary implication, can not be exercised. In the *one* case, therefore, the inquiry is, Has the power in question been *granted?* in the *other*, Has it been prohibited?

*Fourth*, From the principles above laid down, it follows, as a corollary, That an act of a State Legislature, not prohibited by the express words of the Constitution, or by necessary implication, can not be declared void as a violation of that instrument.

These propositions result from the very nature of State sovereignty and legislative power, and have been too long and too well settled in this country to need the citation of authorities.

To apply to a State Constitution, and to a State law the rule of construction applicable to the Constitution and laws of the United States, would deprive the State Legislature of

many of the ordinary and most essential powers of legislation, and make void the great body of our statute laws, the constitutionality of which has never been doubted. And yet, without the aid of the rules of construction applicable only to the Constitution and laws of the United States, it will be difficult, I think, to make even a plausible proof of the unconstitutionality of the Act in question. And such, in fact, it appears to me, has been the course of reasoning adopted to prove the unconstitutionality of this law. It has been urged that the power to pass this law is not given by that clause of the Constitution which permits the taking of private property for public use, nor by that providing for taxation; and so of the various other provisions of the Constitution. This course of argument, it seems to me, is at war with all the principles and every recognized theory of State Government, and the almost uniform current of judicial decisions.

No rule of construction is better settled in this country, both upon principle and authority, than that the Acts of a State Legislature are to be presumed constitutional until the contrary is shown; and it is only when they *manifestly* infringe some provision of the Constitution that they can be declared void for that reason. In cases of doubt, every possible presumption, not clearly inconsistent with the language and the subject-matter, is to be made in favor of the constitutionality of the Act.

The power of declaring laws unconstitutional should be exercised with extreme caution, and never where serious doubt exists as to the conflict.—*Foster, et al. vs. Essex Bank*, 16 *Mass.* 245; *Fletcher vs. Peck*, 6 *Cranch*, 87; *Ex parte McCollom*, 1 *Cow.* 564; *Clark vs. The People*, 26 *Wend.* 599; *Ins. Co. vs. City of New York*, 5 *Sandf.* 10; *Lane vs. Donnon*, 3 *Scam.* 238; *Morris vs. The People*, 3 *Denio*, 381; *Newell vs. The People*, 3 *Seld.* 109; *Flint River S. B. Co. vs. Foster*, 5 *Ga.* 194. And see *Green vs. Graves*, 1 *Doug. Mich.* 352, where these principles are fully recognized. These rules are founded in the best of reasons;

because, as suggested by my brother Manning, while the supreme judicial power may interfere to prevent the legislative and other departments from exceeding their powers, no tribunal has yet been devised to check the encroachments of that judicial power *itself*.

Another rule of construction, founded equally in good sense and judicial decisions, and applicable alike to constitutions and statutes, requires that every word, every phrase, and, *a fortiori*, every distinct provision of the Constitution or the law, must be construed to have its own specific and appropriate meaning, office, and effect.* Apply this rule to the several distinct prohibitions of, or limitations upon, the legislative power, as found in our Constitution, and it necessarily follows that a single, distinct exercise of the legislative power, like that of authorizing the sale of the property in this case for taxes, if it does not come within some one separate and distinct prohibition of the Constitution, does not come within any, or *all of them together*. (I do not mean to say that we may not look to the whole instrument, but we are to do this only to ascertain the true meaning of each specific provision.)

Now, if the particular exercise of the power in question in this cause is forbidden by any single provision of the Constitution, it is void, and it does not need the aid of any other provision to make it so. But if not forbidden by any single provision, it can not be an infringement of the instrument as a whole.

No one who has alleged the unconstitutionality of this law has been willing to trust it to any *one* provision of the Constitution *alone;* but it is contended that, if not forbidden by one, it must be by another. This attempt to base its unconstitutionality upon several distinct and separate provisions of the Constitution, in effect concedes its constitutionality, as it necessarily implies a reasonable doubt whether it

* See *People vs. Burns, ante*, p. 114.

falls within any of the several prohibitions of the Constitution. To doubt which provision of that instrument is violated by it, is to doubt whether it is a violation of any. And if the case be not clear from a reasonable doubt, then, within the principle of all the authorities, the law must be sustained.

But it has been claimed that if this Act is not prohibited by any particular provision of the Constitution, it is void as opposed to the spirit of the Constitution generally. If there be any such spirit, not residing in any particular provision, but resulting from, and surrounding, the entire instrument, it is too subtle to command the recognition of ordinary minds, and too ethereal and intangible to impede the force of a legislative act. Undefined and indefinable in its nature and its attributes, it will, of necessity, assume such as each individual imagination may impart; and its features and functions must be as various and discordant as the infinite diversities of individual minds. It can not, therefore, form a common standard of judgment, nor any safe or permanent basis for judicial decision. I do not say, and I am not willing to say in advance, that an Act of the Legislature might not be so utterly subversive of all the purposes of justice, so oppressive in all its features and objects, and so repugnant to the fundamental principles of republican government, that it ought to be declared void on that account, though it might not conflict with any provision of the Constitution.* But, to warrant such a decision, the case must be an extreme one indeed. There is nothing in the Act before us to call for the application of such a principle.

That this Act is not an infringement of that clause in the Constitution which forbids the taking of private property for public use, is, I think, obvious, as that clause relates only to the taking and appropriation of property, *as such*, by right of *eminent domain*, and not to the taking of property in

*See *Bowman vs. Middleton*, 1 *Bay*, 252.

payment of taxes. This has been expressly decided in the following cases:—*Nichols vs. Bridgeport*, 23 *Conn.* 189; *Guilford vs. Cornell et al.* 18 *Barb.* 615; *Williams vs. Mayor of Detroit*, 2 *Mich.* 560.*

That it does not come within the prohibition against taking the life, liberty, or property of any person "without due process of law" has been sufficiently shown by the opinion of my brother Manning, given in this cause.

That it is not prohibited by the provisions in reference to taxation (upon which more reliance seems to be placed by those who assert its unconstitutionality) is, I think, equally clear. These provisions of the Constitution are in the following words: (Art. XIV.) "SEC. 11. The Legislature shall provide an uniform rule of taxation, except on property paying specific taxes; and taxes shall be levied on such property as shall be prescribed by law. SEC. 12. All assessments hereafter authorized shall be on property at its cash value."

Now, it seems to me obvious that these provisions have reference only to the uniformity of the assessments in respect to the property and persons to be taxed, and the valuation of such property; and that these provisions have been fully complied with when the Legislature have provided by law for a uniform system in these respects. That the present law has fully provided such uniform system, is not denied. When, therefore, the assessment has been completed according to this provision of the Constitution and the law (which is not questioned in this case), these provisions of the Constitution, having been fully satisfied, have spent their force as relates to this tax, and have ceased to operate upon it. There is nothing in the language of these provisions to warrant the inference that they were to extend down through and beyond the assessment, and to operate upon the collector as to the *mode of proceeding* for *enforcing payment* of the tax thus duly assessed. Such a construction would depart

*See opinion of the Chief Justice in *Clark vs. Mowyer, post.*

entirely from the language. The *rule* of taxation is *one* thing; the *mode* of collection (after it has been assessed according to the rule) is *another* and a *different* thing, and one which the Constitution has not attempted to fix.

But it is claimed, *First*, That the taking of the property in this case must be justified, if at all, by the power of taxation; and *Second*, That the Legislature have no power on this subject, not specifically given and defined in the provisions of the Constitution having express reference to this particular subject.

The first proposition may be admitted; the property was, at least, taken to satisfy a tax. The second proposition is erroneous, as I have already shown, and it has been expressly repudiated by this Court in a decision upon a question of taxation.—See *Williams vs. Mayor of Detroit*, 2 *Mich.* 560.

The specific objection to the constitutionality of this law is that it authorizes the taking of one man's property for the debt of another; it is this feature of the law, only, which is claimed to render it unconstitutional. But this particular provision of the law is not a new one as applied to the collection of taxes: it is much older than the Constitution. It has prevailed in the State of New York at least since 1813 (see 2 *R. L.* 1813, *pp.* 512, 513, §9; and 1 *N. Y. R. S. pp.* 397, 398), and is still in force there, unless quite recently repealed. And though constitutional questions have perhaps more frequently arisen in that State than in any other, I can not learn that the constitutionality of this provision has ever been questioned. [From the statute of New York of 1813 it was substantially copied into the territorial laws of Michigan in 1833 (see *R. L. of Mich.* 1833, *pp.* 92, 93); and through all the numerous changes in the tax-laws of Michigan, this particular feature, with slight verbal alterations not affecting the principle, has prevailed and continued in force until repealed at the session of the present year. It was in force in 1835, when the first Constitution was adopted; it was

re-enacted, under that Constitution, in 1838 (*R. S. of* 1838, *pp.* 85 *and* 86, §§ 2 *to* 4); again in 1842 (*S. L. p.* 91, §§ 24 *to* 26); again in 1843 (*S. L. p.* 71, §§ 32 *to* 34); and by the Revised Statutes of 1846 (*Chap.* 20, §§ 38 *to* 41). This last law, in the very words of the present, was in force at the adoption of the present Constitution, in 1850. It was re-enacted under the present Constitution in 1853. This particular feature of the law has, therefore, been in force without intermission, in Michigan, from 1833 to 1858. It is true the laws of 1838, 1842, and 1843 do not expressly declare that " No claim of property made thereto by any other person shall be available to prevent a sale "; but such was the clear intent and the necessary effect of those laws, as they authorized the collectors to seize and sell "any goods and chattels in the possession of the person taxed "; and this will be rendered perfectly clear by the subsequent provisions in each of these three laws for the disposal of the surplus arising from such sale.

I have been able to examine the statutes of but few of the other States; but I find the same principle, in a still more objectionable form, in the State of Vermont. Thus, where a constable has failed to make return and pay over taxes, the sheriff, on an extent, if unable to find property of the constable, "may levy and collect the same of any inhabitant of the township," who is to have his action against the township for the amount. — *R. S. of Vt.* 1840, *p.* 375, §§ 17, 18. Several of the States expressly prohibit replevin for property taken for taxes; and this involves the like principle, as it puts the owner, when his property is taken, to his action, as much as the statute now in question.

I have been unable to find any decided case in which the constitutionality of any of the laws above referred to has ever been questioned. Certainly, the long period during which these laws have been in force, here and elsewhere, and the general acquiescence of the people in their propriety, present the case in a different aspect from what it would wear if

now enacted for the first time; and should make us pause long and carefully before pronouncing the law void. Length of time during which a law has existed, general acquiescence, and cotemporary legislative construction of constitutional provisions, are always recognized as important elements in determining the constitutionality of a law. — See *Sedgw. Const. & Stat. L.* 487, 488; *United States vs. Hudson,* 7 *Cranch,* 32; *Benson vs. Bank of Kentucky,* 11 *Pet.* 319. The long acquiescence in such a provision here and elsewhere, proves the existence of a general and strong conviction in the public mind of the necessity of a more prompt and efficient mode of collecting the public revenues, than for the collection of ordinary debts. The public exigencies demand regular and prompt payment of taxes, and can not brook the delays and risks of private litigation between individual claimants of property. In the collection of taxes, therefore, this law adopts the presumption of property arising from possession, the most obvious index of title; and, as between the government and the possessor or other claimant, makes that presumption conclusive; giving, however, to the owner or other person interested, should he turn out to be other than the possessor, his action over, against the person in whose possession it was found, and for whose tax it was taken, and leaving the parties to settle the question of title, and their respective rights, between themselves.

In doing this, the law has adopted no new principle, but has simply applied, in behalf of the government, principles which, as between individuals, and for the collection of a certain class of claims, are as old as the common law itself. In other words, it has adopted the main principles which govern *distress for rent.* It has not even changed the name of the remedy; for, on the face of this statute, and of every statute we have ever had upon this subject, it is denominated a *distress.* Such also is the case with the law of New York, and in most of the States it is the name given to the proceeding for the collection of taxes. I do not mean to assert

that the remedy for the collection of the tax under this stat-
ute, is in *all respects identical* with that of distress for rent.
There are minor differences, but none, I think, which affect
the main feature of taking the property of one person for
the debt of another.

That the taking of property of a stranger found in the
possession of a tenant on the premises, and for his rent, was
founded on the presumption of title arising from the posses-
sion, can not, I think, be successfully denied.—See 3 *Bl.
Com.* 7; 3 *Bouv. Inst.* 35; *Spencer vs. McGowen*, 13 *Wend.*
256; *Reeves vs. McKenzie*, 1 *Bailey*, 497.

But it has been insisted that the statute in question in
this case does not go upon the presumption of property from
possession, because it expressly gives a remedy to the true
owner against the person in whose possession it was found,
and for whose tax it was taken; but this is precisely what
the common law did in the case of a distress for rent under
the like circumstances.

"But, generally speaking" (says Blackstone), "whatever
goods and chattels the landlord finds upon the premises,
whether they in fact belong to the tenant or a stranger, are
distrainable by him for rent; for, otherwise, a door would
be open to infinite frauds upon the landlord; and the stranger
has his remedy over by action on the case, if, by the tenant's
default, the chattels are distrained so that he can not render
them when called upon."—3 *Bl. Com.* 8.

It may be said also that the distress grew out of the
contract or the relation between landlord and tenant; but
this can not affect the stranger whose property is taken, and
who is not a party to the contract or the relation.

It may also be urged that under this law of distress a
stranger's property could only be taken when found upon the
premises of the tenant upon which the rent was due.    In
this respect, the case before us is precisely parallel, as the
property was found upon the premises taxed.

I do not conceive that this circumstance makes any dif-

ference in determining the question of legislative power. But should it be held essential to the exercise of such power, the law can not in this case be adjudged void because it might violate a constitutional right in some case *not yet before the Court.* This would be to vest the Court with a general revisionary power, under which they might inspect the whole body of our statute laws, and issue their edict of unconstitutionality against any statute, without waiting for a case to arise involving the question. This consideration has sometimes been overlooked by the courts; and judges have, in some few instances, placed considerable stress upon some possible violation of constitutional right, not involved in the case before them, and apparently made such considerations a partial ground for treating the law as void. But it is quite evident, upon principle, that this is entirely departing from the true sphere of judicial power. It is always time enough for the courts to declare a law to be void when the case before them shows that a constitutional right has been, or will be, violated in the particular case, by carrying the law into effect.

It does not become necessary, in this case, to determine the question whether the statute, in adopting the main features of distress for rent at common law, might not be construed as exempting from seizure, to the like extent as at common law, the property of third persons; because, upon such third person, claiming such exemption for the benefit of trade, rested the burthen of showing the facts constituting such exemption: and there is not enough shown in the present case to bring the property within any such exemption at common law. Had the lumber been landed at the dock, in the course of transportation from and to some other place, or had it appeared that it had been manufactured from logs of the plaintiff, the question of exemption might have been raised on the ground above indicated.

This remedy of distress for rent is still in force and in constant application in some ten or eleven States of the

Union. In some of these States it is governed by the common law as modified by the early English statutes; in others, it has been modified and regulated by State statutes. But in nearly all of them, the primary distinguishing features of a distress, upon which the statute now before us depends, are still preserved; viz., 1st, The presumption of title from possession of personal property; 2d, The taking of the property of another person, found in the possession of the tenant, for the rent of the tenant; and, 3d, The right of action by the true owner, or other person in interest, against the tenant, for the value of the property. Some few of the States have confined the remedy to the property of the tenant himself; most of them have enlarged the common law exemptions of the property of strangers for the benefit of trade; and in most of them, the statute has given the remedy the force and sanction of a legal proceeding, requiring it to be conducted under a warrant from a magistrate, and by an officer of the law. In all of them the distress is authorized to be sold for the payment of the rent, instead of being retained as a pledge, as at common law.—See, for a summary of the American Law of Distress, 3 *Bouv. Inst.* 25 *to* 43; 3 *Kent Com.* 471 *to* 485. New York abolished distress for rent in 1846; but for the law on that subject (before the repeal), in reference to taking property of strangers, see *Spencer vs. McGowen,* 13 *Wend.* 256; *Wright vs. Williams,* 5 *Cow.* 338; *Gilbert vs. Moody,* 17 *Wend.* 354; *Matthews vs. Stone,* 1 *Hill,* 566; *S. C. reversed,* 7 *Hill,* 428. For the like principle in other States, see *Stevens vs. Lodge,* 2 *Blackf.* 594; *Harris vs. Boggs,* 5 *Blackf.* 48; *Applegate vs. Crawford,* 2 *Ind.* 579; *Elford vs. Clark,* 2 *Brev.* 88; *Riddle vs. Welden,* 5 *Whart.* 9; *Parker's Appeal,* 5 *Barr,* 390; *Greider's Appeal, Ibid.* 422; and see 7 *B. Monr.* 31.

Though the judges in several of the States have spoken of the harshness and injustice of this feature of the law, I can not find that its constitutionality has ever been denied. In North Carolina, it is true, it has been decided not to be

in force as a part of the common law, being inconsistent with the nature of their institutions. But that was not a question of legislative power. And, while I fully admit the impolicy and injustice of adopting distress for rent in this State, yet I am not prepared to deny, in advance, the constitutional power of the Legislature to adopt it. If it be unconstitutional, the people of several of our sister States have for many years been suffering a constant and systematic violation of their constitutional rights, without the knowledge of the courts or the bar, and without themselves becoming aware of the fact.

But if the principle of taking the property of one man for the debt of another can be justified as an exercise of legislative power for the benefit of individuals, to enforce the prompt payment of rent, much more can it be justified for the collection of the public revenue, upon which the welfare of the whole community depends. And every consideration which can be urged for the support of the former, applies with equal, and most of them with greatly increased, force, to sustain the latter. If it be important to the interest of the landlord to secure prompt payment of rent, it is doubly important to the State to secure prompt payment of its revenue. If it be necessary to act upon this presumption of title from possession to avoid collusion between the tenant and other persons when his rent is to be paid, and to avoid the embarrassment and difficulty of ascertaining the true ownership, and the delay and expense of litigation, the necessity is as much greater in the collection of public taxes as the interests of the whole community are greater than those of any one class. If all owners of personal property are bound to take notice of the public law of the State giving distress for rent, and the leaving of their personal property in the hands of a tenant may be construed as an implied assent of the owner to the risk of its seizure for the tenant's rent, equally must all men be bound to notice the statute in reference to the collection of taxes, and with much

more reason may they be held, when they permit their property to remain in the possession of a person taxed, to assent to the right of seizure and sale implied from such possession. Rent may become due at any time; taxes only once a year, and during a small portion of the year fixed by the statute itself.

But a distress for rent is not the only instance in which, by the common law, the property of one person may be taken for the debt of others. A similar principle is involved in the common law mode of collecting debts on executions against quasi-corporations having no corporate fund, where, if a statute give an action against such quasi-corporate body, the property of any individual member may be taken for the debt, and he is ·driven to his action against the other members.—See *Angell & Ames on Corp.* § 629; *Russell vs. Men of Devon,* 2 *T. R.* 667; *Riddle vs. Proprietors, &c.* 7 *Mass.* 187; *Merchants' Bank vs. Cook,* 4 *Pick.* 414; *Adams vs. Wiscasset Bank,* 1 *Greenl.* 361; *Opinion of Lord Elden in Attorney General vs. Essex,* 2 *Russ.* 63.

The same principle is involved in the Vermont statutes for the collection of taxes, already cited. And in that State, by express statute provision, the same principle is applied in collecting, on execution, all debts against counties, towns, and school districts. The property of any inhabitant may be taken for the debt, and the statute gives him an action against the county, town, or school district, for the amount, with the interest at twelve per cent. — *R. S. of Vt.* 1840, 379, 380. Other instances of a similar kind, I presume, might be found in other States having constitutions as stringent as our own.

Will it be said that the common law and the statutes, involving the like principle, are based upon the idea of the membership of the person whose property is taken, and that, in theory, he is a participator in the responsibility, and thus accountable for the default of the entire body? If this be so, it is more purely a fiction of law, with less of reality and

good sense for its support, than the presumption of title from possession in distress for rent, and in the Act of the Legislature now before us. Yet few, I presume, would doubt the constitutional power of the Legislature to establish or restore this common law remedy against quasi-corporations here.

Again: I think the power of the Legislature has never been doubted to change the form of civil remedies, so as to abolish entirely the action of replevin; yet this would involve a similar principle, as the owner whose property might be taken on execution for another man's debt, without a remedy for the recovery of the property itself, would be driven to his action for the value and damages; which is substantially what is done by the present law.

After a careful consideration of this case, I can see no ground for holding this law unconstitutional, or void, without violating all the well settled principles of construction in such cases.

I must, therefore, concur with the Chief Justice and my brother Manning in the conclusion that the judgment of the Court below should be affirmed.

MARTIN Ch. J. concurred in the preceding opinions.

CAMPBELL J. *dissenting:*

Not being able to assent to the views of my brethren who have concurred in the decision of this case, I proceed to state the reasons which have impelled me to dissent from them.

The question involved is, Whether the Legislature have a constitutional right to authorize one man's property to be seized and sold for the taxes of any other person in whose possession the same may happen to be for the time being, without allowing any redress except an action against the person for whose taxes it may be sold.

I am constrained to say that I have been unable to find any foundation for such a power in reason or authority.

Private property may be constitutionally subjected to public control in several ways, in such a manner as to produce great hardship, and in some cases gross injustice. There is doubtless a very extended power to provide regulations concerning the use of property, which may be classed under the somewhat indefinite name of police regulations. I am not prepared to admit even this power to be unlimited, for there are constitutional provisions which limit this, as they do any other discretionary power. Authority also is possessed by the Legislature to enforce forfeitures for breaches of the penal laws, in many cases. But it can not be claimed that the case at bar falls under either the police or the penal laws.

Beyond these the power of the Legislature is confined by constitutional provisions, which an unbroken line of authorities has construed and defined. Private property is recognized as already existing, and as the basis of all governmental action. For its protection, governments are created, and can only exist by preserving it. Our Constitution contains many provisions for its immunity, and in those provisions, as passed upon by courts of justice, will be found, in my opinion, conclusive evidence of the illegality of this legislative usurpation. It has declared that the property of no person shall be taken for public use, without just compensation therefor; that no person shall be deprived of his property without due process of law; that the Legislature shall provide an uniform rule of taxation except on property paying specific taxes; and that all assessments shall be on property at its cash value. It is unnecessary to go further into the details of the Constitution, for the clauses referred to, as repeatedly construed, are sufficient to dispose of the case.

That property, which is protected by the law, should not in turn be subject in some degree to the duties and charges necessary to maintain the protecting power, no one has ever questioned. Governments can not be maintained without revenue, which must come directly or indirectly from the property and persons under their jurisdiction. Highways and other facil-

ities for travel and commerce are necessary, and there must be some authority to place them where they are needed. And the public defense frequently requires that government should have a choice of situations for its forts. But except for revenue to carry on the legitimate operations of the public administration, and for the construction of roads or other public works, no court, and no authority, has as yet discovered any purpose for which private property can be constitutionally appropriated to the public disposal. There is but one other disposal which can be imagined, and that is the taking from one person to bestow it upon another. — *Sedgw. on Stat. & Const. L.* 533.

At the common law, and under all our Constitutions, the principle has always been recognized that no man can be called upon to contribute more than his regularly and legally ascertained share of the public burdens. Uniformity of taxation is the only rule which would ever be tolerated in a free country. For this our own Constitution has certainly provided. The very term "Tax" signifies a tribute or imposition which is "certainly and orderly rated" (*Tomlyn's L. Dic.*), and not an arbitrary or unequal one. Whether the sum to be raised be a State tax, to be levied throughout the State; or a county, town, or district assessment, confined to a smaller territory, the rule of contribution must, in each case, be a proportional one, and conformed to some uniform standard. And where the private property of any person is needed for the public use, this same principle requires, and the Constitution provides, that he shall not bear this appropriation as an additional burden, but that he shall be paid its full value before he can be called upon to part with it: he can not be required to part with it upon public or private credit. — *Williams vs. Mayor of Detroit,* 2 *Mich.* 566; *Bloodgood vs. Moh. & Hud. R. R. Co.* 18 *Wend.* 18, 27, 35, 37, 76.

The power of government either to take property or to tax it, depends on what is properly called its super-eminent sovereignty, or *eminent domain,* which, in its broadest sense,

5 MICH. — S.

embraces all the ultimate powers of the State. But in our modern decisions this latter phrase has been more generally confined to the actual taking of property for public use, as distinguished from the other modes of acting upon it. It has been used in both senses by our own Court in *Swan vs. Williams*, 2 *Mich.* 427, and *Williams vs. Mayor of Detroit*, 2 *Mich.* 560. The powers are all identical in origin, but the distinction is a convenient one, and saves circumlocution. The extent and limits of these powers have been well expressed in the case of *The People vs. Mayor of Brooklyn*, 4 *Comst.* 419; which was accepted by our Supreme Court, in the case last cited, as authority upon this subject, so far as not modified by our Constitution. I quote from the language of that decision: "Private property may be constitutionally taken for public use in two modes: that is to say, by *taxation*, and by right of *eminent domain*. These are rights which the people, collectively, retain over the property of individuals, to resume such portions of it as may be necessary for public use. The right of taxation and the right of eminent domain rest substantially on the same foundation. Compensation is made when private property is taken in either way. Money is property. Taxation takes it for public use, and the taxpayer receives, or is supposed to receive, his just compensation in the protection which government affords to his life, liberty, and property, and in the increase of the value of his possessions by the use to which the government applies the money raised by the tax. When private property is taken by right of eminent domain, special compensation is made, for the reason hereafter stated." — 4 *Comst.* 422, 423. "Taxation exacts money, or services, from individuals, *as and for their respective shares of contribution to any public burthen*. Private property taken for public use by right of eminent domain, is taken, *not as the owner's share of contribution to a public burthen*, but as *so much beyond his share. Special compensation is, therefore, to be made in the latter case, because the government is a debtor for the property so taken ;*

but not in the former, because the payment of taxes is a duty, and creates no obligation to repay, otherwise than in the proper application of the tax. Taxation operates upon a community, or upon a class of persons in a community, and by some rule of apportionment. The exercise of the right of eminent domain operates upon an individual, and without reference to the amount or value exacted from any other individual or class of indivduals. Keeping these distinctions in mind, it will never be difficult to determine which of the two powers is exerted in any given case."—p. 424.

And I may refer to the very strong language of this Court, in 2 *Mich.* 567, that "Taxation not based upon any idea of benefit to the person taxed, would be grossly unjust, tyrannical, and oppressive, and might well be characterized as public robbery." And, further: "Some of the provisions of the Constitution herein before referred to, and several others, were cited by the counsel for the complainant, for the purpose of showing that it enjoins a just principle of equality in regard to all public burdens, and prescribes, as a limit to the exercise of the taxing power, that common burdens should be sustained by common contributions, regulated by some fixed general rule, and apportioned according to some uniform ratio of equality. This may be readily admitted as a just and equitable rule. The soundness of such a proposition is too well approved by good sense, and too well supported by the theory of free government and equal rights, to be seriously questioned."—pp. 569, 570.

We are not, therefore, left to doubt in examining into this statute, to determine how it can be justified. If the arbitrary proceedings which it sanctions and requires are not sustainable, either as the legitimate exercise of the taxing power, or of the right of *eminent domain* in its sense as above defined, they can not be sustained at all.

I will now refer to those proceedings for the purpose of applying to them these tests.

Section 822 of the Compiled Laws provides as follows:

"In case any person shall refuse or neglect to pay the tax imposed on him, the treasurer shall levy the same by distress and sale of the goods and chattels of said person, *or of any goods and chattels in his possession*; wherever the same may be found within his township; *and no claim of property to be made thereto by any other person shall be available to prevent a sale.*" Other sections provide that if the property sold brings more than the tax, the surplus, if any one but the person taxed claims it, shall be deposited in the town treasury until they shall litigate their claims—no provision being made for interest upon it. Section 931 provides that the owner may sue the person whose tax it was taken to pay, for the value of the property, after deducting such surplus. No provision is made whereby the owner may save his property from sale by advancing the tax. Section 5008 forbids any action of replevin against the collector. *The law provides no remedy in case the person for whose tax it was sold is insolvent, or in case he had a valid defense against the tax.*

These provisions have been repealed, and the law, in this respect, has been placed upon a more equitable basis. The question before us is, whether it needed a repeal to invalidate it. That the law, for many years before the official opinion of the Attorney General advised the executive department of its unconstitutionality, was regarded and treated as a nullity in some quarters, at least, of the State, is very well known. But popular usage can not confer or take away constitutional power; and it is not, in a case like this, of much value as an exponent, one way or the other. The powers of the government, in its sovereignty, are based upon a more certain tenure.

Is, then, the taking of property, authorized by this Act, a legitimate exercise of the taxing power? If so, how does the law proceed to affix to this property the liability to be used for the satisfaction of the public necessities?

It has been suggested that the Legislature may, if they see fit, create a lien upon personal property for taxes, and

tax it specifically as they do real estate; and that, having this power, it follows that they may sell it in the hands of any one. I do not perceive how the conclusion follows from the premises. Whether they have the power to tax personal property specifically as lands are taxed, and create a similar specific lien, is not very material here, in my view of the case. It is enough to say that the State has never seen fit to assert such a power. When the power is claimed and exercised, it will be time enough to test its validity. The Constitution allows the Legislature to exempt property from taxation. In carrying out the purpose of raising revenue, the law, so far as personal chattels are concerned, does not tax the property as such, but taxes the owner for its value, and does not undertake to charge non-residents at all. Unless a non-resident owns real estate, he is not taxable, and in the eye of the law owes no pecuniary duty to the State. This is in accordance with the recognized doctrine of international law, that movables have no locality, but follow the person of the owner, and are governed by the law of his domicil.— *Story Confl. L.* §§ 379, 380. This doctrine has been too long settled to be questioned, and is distinctly declared by this Court in the case of *High, Appellant*, 2 *Doug. Mich.* 515. The State has no right under the Federal Constitution to levy import or export duties (§ 10, *Subd.* 2); and there are many considerations which would render the attempt to tax the personal property of non-residents highly improper, if not illegal, as the tax might stop it *in transitu*, and must, in many cases, do so, to be enforced at all, unless the owner had other effects liable to seizure.

This property, therefore, is not seized, and is not liable to seizure, either for a tax levied specifically upon it, or upon its owner. He owes no tax, and the property owes no tax. The law saves us from any ambiguity on this subject. It directs it to be taken only when the tax is against some person, and then in express terms treats it as the property of another. The tax when levied against "A." is to be sat-

isfied by a seizure and sale of the property of "A.," or of·
any property in his possession.    The law does not even go.
through the form of declaring his possession proof of owner-
ship.   If it did so, it could not help the case, for it can not
matter by what terms a man's property is divested; whether
the Legislature grant it to another, or declare it to be the·
property of another.   The divestiture is the evil, in whatever·
way it happens.    Here, in every section, the law recognizes.
the property possessed as belonging to the real owner.   It
forbids his re-claiming it, and gives him an action to recover
its value.    There is no disguise or circumlocution in the.
statute.    If justified at all, it must be ˈupon some ground
which will authorize the Legislature to seize the property of·
any one to satisfy his neighbor's tax.    The law makes no
distinction between property rightfully and wrongfully pos-
sessed by the real debtor.   And whatever courts may desire.
to do, they can not, on any principle of interpretation, con-
fine the effect of these provisions to property lawfully pos-.
sessed.    The provision forbidding a release of the levy has.
no exception, and the replevin law has no exception.    The.
law could have intended none.   The only plausible reason for·
the enactment of such laws must be found in the supposed
difficulty which a town treasurer may have in settling the
true ownership of the property.   It can not be any easier·
for him to determine two questions than one.   To give the.
law the interpretation referred to, the collector must, at his.
peril, determine, *first*, whether the property belongs to any·
one but the possessor, and, *second*, whether such owner has
entrusted it to the possessor for any purpose which justifies
his continued possession.    This construction would not help
the collector, while it would justify him, as it now justifies.
him, in taking property which he knows, or may know, is.
owned by a stranger.    The consequences of upholding such
a law are certainly extraordinary.   To say nothing of unlaw-.
ful holding by the person taxed, every traveler whose baggage.
is handled by a carrier or innkeeper, every merchant whose.

goods pass over a wharf or through a warehouse, must be prepared, whether he lives in one State or another — in addition to the usual perils of the sea, the acts of God or the public enemy — to have his effects confiscated for the default of a stranger to whom he owes nothing, and who has obtained no credit on his account; to have them sold at a forced sale away from markets and bidders, and have his only recourse against a man who may be insolvent, who ' must generally be fraudulently disposed, and who may have a complete defense to any action whatever. If this is a legitimate exercise of the taxing power, I do not well perceive under which of the qualifications it is to be classed.

Not only is the property seized for a tax not charged against itself or its owner, but it is made liable upon no rule of apportionment. If we accord all the latitude desirable as to the method of apportionment, there must, at least, be some means of certainty in the allotment, to make a tax good. The whole of a man's property is often in the hands of a bailee. A merchant's or emigrant's goods may be so held, up to the last dollar he owns. Under this law, whether the amount be small or great — whether the whole or the half, or a mere trifling percentage of its owner's means — it is equally liable to confiscation.

The whole basis of the right of taxation, as laid down by the authorities, is wanting in this Act. There is neither duty, benefit, nor apportionment. It is but the excess of arbitrary power. That it is done under a general statute can not ameliorate its character. A law authorizing property to be taken for private roads, was not the less an invasion of the Constitution, because any one might have a road laid out. — *Taylor vs. Porter*, 4 *Hill*, 140. The Legislature could not evade the necessity of paying for land used for railroads, canals, or highways, by general laws for their organization. It could not legalize an invasion of due process of law by authorizing every citizen to be judge, jury, and sheriff in his own case, to do what was right in his own eyes. The Con-

stitution was not designed to protect private property from only one species of attack: it was meant to keep the Legislature from violating it in any way whatever. The case of *Hibbard vs. The People*, 4 *Mich.* 125, is authority, if any is needed, that the general nature of a law can not exempt it from the prohibitions of the Constitution against invasions of private right. The claim that the public necessity must override all minor considerations is inadmissible in a constitutional government. That there is no absolute and overruling necessity has been determined by the Legislature in repealing the Act. But no necessity whatever can justify a violation of the Constitution. In cases where the Legislature have unlimited discretion (if such cases exist), no plea of necessity is needed, and the courts have nothing to do with the hardships which may arise. Laws which are within the legislative discretion, must be enforced without question.

If this case does not come within the taxing power, we must advert to the power to take private property for public use. There is certainly a *taking* here. The law authorizes the officer to seize the property bodily, and to sell it; and he has followed the law. But it would be almost a waste of words to examine at length whether this is a taking for public use authorized by the Constitution. Where property is taken for public use, it must be a use of the property itself, for the public purpose, either temporary or permanent. Sometimes it may be a destruction of it, as of a house which obstructs a fort or highway; but more generally it is the *use* of the specific thing, as of land for a road, or gravel for its completion. But when property is taken, not for use, but for sale, such a taking is justifiable on no such ground. — *West River Bridge Co. vs. Dix*, 6 *How.* 544, *et seq.* (*Opinion of Woodbury J.*); *Williams vs. Mayor of Detroit*, 2 *Mich.* 566. And a comparison of the three clauses in our Constitution which govern on this subject, will show that the property liable to be taken must generally, if not always, be real estate. The taking must (except in the case of private roads),

be for some purpose in which the public are all alike entitled to enjoyment. — *Swan vs. Williams*, 2 *Mich*. 427. I have already referred to the necessity of previous compensation.

This taking is not a taking for public use. It is in effect a taking for private use, so far as its benefits go. The property seized is to be sold to pay the debt of another person. Its proceeds cancel his debt to the State. He is liable to make compensation for it — not, however, a previous compensation, but such as may ensue upon a lawsuit of doubtful validity, against a debtor of doubtful solvency. Authorities are unnecessary to show that no such power exists in the Legislature. If a sheriff, upon a private claim, were authorized to do what the town treasurer may do under this law upon a public one, no one would hesitate a moment to condemn the law as void. When the Constitution, which was created to define the powers of government, and not leave us to any tender mercies of parliamentary omnipotence, undertakes to protect private property, it can not be competent for the Legislature, by giving its own definitions, and calling that due process of law which condemns without a hearing, and robs without redress, to evade the rules made for its guidance. The Constitution, when referring to property, must, according to the usages of the civilized world, use the term in its commercial and legal sense, which derives its whole value from its merchantable qualities. As ships " are built to plough the sea, and not lie by the walls," so personal property is made to sell and exchange from hand to hand, and be transported from one region to another. Our lumber would be useless in the woods, and our grain in the fields. The owner can not retain manual possession of it, but must entrust its transmission to those who are, not only by custom, but by law, recognized as proper agents for that purpose. And that protection is a mockery which removes the aid of the law the moment the necessity of that aid is created by the entrusting of such property to customary agents. I am not disposed to question the right of the Legislature to

issue this summary warrant to collect any lawful tax. The warrant is not objectionable merely because it is summary. But there never was any warrant of distress issued to collect a tax charged against any one personally, whereby any property except that of the crown debtor could be seized. The distress warrant for that purpose was a mere execution, required by Magna Charta to be satisfied, first, out of the goods and chattels of the debtor, and, in default of those, by extent upon his real estate. His pledges could not be pursued until the remedy had been used against him. The term distress, applied to the warrant, had no similitude to the feudal distress for rent, either in reference to the seizure of property or its disposal. And that clause of the Constitution which forbids the seizure of property without due process of law, can not be so construed as to leave the Legislature free to devise any new process at its will. — *Murray's Lessee vs. Hoboken Land Co.* 18 *How.* 272.

I am of opinion, for these reasons, that the Act of the Legislature under which the property in question was taken, was void, as in conflict with the Constitution. It is void, if enacted under the taxing power, because the property was not taken for any tax levied against its owner, or on the property itself: it is void if taken for any other purpose, because not taken for public use, or upon just compensation. It is taken for no penal offense, and for no violation of any police regulation. It is taken upon no judgment or other claim against its owners. I can imagine no other legal ground upon which it could be so taken; and no reason has been presented which, to my comprehension, removes this statute from the class of unauthorized and arbitrary invasions of constitutional right. If such laws can be maintained, I can see no limit to the power of legislatures. I am not prepared to submit to any such doctrine.

It is, I admit, much to be lamented that courts are so often called upon to decide constitutional questions. I think the evil exists in the occasion for raising them, and not in

their being raised. If there is any strife between legislatures and courts on this subject, the encroachments have not come from the courts. Hasty and careless legislation has done much to unsettle the laws of property; and if courts have erred at all, it has been in seeking excuses for well-meant but unauthorized attempts to subject principles of law to some imagined expediency. Courts have no right to set aside laws upon their own notions of propriety, if they are constitutional. But every unconstitutional law which is made to stand, creates a permanent and deadly evil, by overturning the only safeguards which we possess against public usurpation.

I think the judgment below should be reversed.

*Judgment affirmed.*